**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 17 2019 ★

BROOKLYN OFFICE

Marc P. Berger
Lara Shalov Mehraban
Amy Gwiazda*
Sandeep Satwalekar
Eric Forni*
Kathleen Shields*
Rhonda Jung
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0161 (Satwalekar)
*Not admitted in the U.S. District Court for the Eastern District of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     **Plaintiff,**<br><br>  v.<br><br>GARRETT M. O'ROURKE and MICHAEL J. BLACK,<br><br>     **Defendants.** | **CV 19  4137**<br><br>Civil Action No. 19-CV-____ (___)<br><br>**JURY TRIAL DEMANDED**<br><br>MATSUMOTO, J.<br><br>KUO, M.J. |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the

following against defendants Garrett M. O'Rourke ("O'Rourke") and Michael J. Black ("Black,"

and collectively, the "Defendants"):

## SUMMARY

1.  This is a securities fraud enforcement action.  From approximately May 2016

through July 2018 ("the "Relevant Period"), the Defendants schemed to fraudulently sell the

stock of AV1 Group, Inc. ("AV1 Group"), EnviroTechnologies International, Inc.

("EnviroTechnologies"), and other publicly traded companies such as Cyberfort Software Inc. ("Cyberfort"), to investors in the public United States securities markets. O'Rourke and/or Black, working together and with others, (a) made false or misleading statements to investors about each company through high pressure stock promotional campaigns; and, (b) at least as to EnviroTechnologies, disguised their control over the company and virtually all of its stock that was available for public trading (the "Float").

2.      In furtherance of the scheme, O'Rourke aggressively touted AV1 Group, EnviroTechnologies, and other publicly traded companies to prospective investors, including elderly retail investors, using high-pressure sales tactics through unsolicited cold calls during which he repeatedly lied about his association with legitimate financial institutions and the prospects of the companies. O'Rourke further promised these investors that he had their best interests in mind, and that he had found promising investment opportunities for them. In actuality, O'Rourke cold called investors to persuade them to purchase these stocks so that he and his partners, including Black, could sell their holdings of these stocks for a profit.

3.      Black knew that O'Rourke promoted AV1 Group to potential investors to facilitate the sale of the Defendants' stock. Black coordinated the sale of AV1 Group stock with the timing of O'Rourke's AV1 Group stock promotional efforts, and Black subsequently split the proceeds of those stock sales with O'Rourke. The Defendants' victims, including the elderly retail investors who invested their retirement savings based on O'Rourke's material misrepresentations, were left holding losing investments while the Defendants profited handsomely.

4.      The Defendants also schemed to disguise the fact that they controlled EnviroTechnologies because, as they knew, control persons are required to: (a) register the stock

with the Commission pursuant to Section 5 of the Securities Act of 1933 (the "Securities Act")

[15 U.S.C. § 77e] prior to selling stock; (b) sell the stock pursuant to an applicable exemption

from registration; or (c) sell the stock pursuant to sale limitations and other conditions set forth in

SEC Rule 144 [17 C.F.R. § 240.144].  Such registration requirements and sale restrictions are

critical safeguards designed to inform investors about the nature of the stock they are holding or

considering buying, and from whom they would be buying that stock.

5.      The Defendants, who were control persons of EnviroTechnologies, schemed to

defraud investors by disguising their control over the company and illegally selling its stock in

the public securities markets.  To facilitate the scheme, Black directed EnviroTechnologies to

distribute millions of shares of stock to offshore nominee entities.  Black and O'Rourke then

coordinated with one or more foreign asset managers fraudulently to sell their

EnviroTechnologies' stock through those nominees' business accounts, generating millions of

dollars in illicit proceeds.

6.      Black also arranged fraudulently to sell stock of at least AV1 Group through at

least one brokerage account held by companies under his direct control.  For example, Black

solicited the help of an individual he believed to be a broker, or a representative of brokers, who

said he would be willing to purchase shares of AV1 Group stock from Black on behalf of his

brokerage customers in exchange for a kickback (*i.e.*, a secret payment to the "broker" as

consideration for the broker purchasing the stock for his customers).  In actuality, the "broker"

was an undercover agent (the "UC") working for the Federal Bureau of Investigation who

surreptitiously recorded telephone calls and at least one meeting with Black.  In those calls and

meeting(s), Black and the UC discussed, in substance, (a) engaging in trades designed to create

the artificial appearance of arms-lengths market transactions where Black would enter an offer to

3

sell stock at a specific price and the UC would enter a bid to buy the stock at that specific price, thereby matching orders or engaging in "cross" trades; and (b) paying a kickback to the UC so that he would buy Black's stock on behalf of unsuspecting brokerage customers.  Black subsequently engaged in several "cross" trades with the UC, and arranged for kickbacks to be paid to him.

## VIOLATIONS

7.      As a result of the conduct alleged herein, O'Rourke violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Black violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission seeks emergency preliminary relief, including a temporary restraining order against further violations of the federal securities laws and an emergency asset freeze to preserve the assets necessary to satisfy an eventual judgment against the Defendants. The Commission also requests an immediate accounting, a repatriation order, and an evidence preservation order to facilitate the prompt resolution of this matter on the merits.

9.      The Commission further seeks a permanent injunction against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)], orders barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Eastern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. For example, during the Relevant Period, individuals who reside in the Eastern District of New York purchased the stock of EnviroTechnologies and AV1 Group during the Relevant Period.

## DEFENDANTS

12.     Garrett M. O'Rourke ("O'Rourke"), age 31, is a resident of Miami Beach, Florida. O'Rourke owns and operates three United States-based corporations: Tactical Holding Corp., DRG America, Inc., and Lion Media Corp.

13.     Michael J. Black, ("Black"), age 66, is a resident of Maryland and the founder of EnviroTechnologies. Black was the President and sole director of EnviroTechnologies until July 2016. Black owns and operates four United States-based corporations: Neoventive LLC, Arc Development Group, Inc., Sencha Corporation, and Signal Wave LLC.

## RELATED PARTIES

14.     AV1 Group describes itself as an investment and holding company "established to identify, secure, and monetize emerging growth companies, technologies and ecommerce businesses positioned for exponential growth." AV1 Group (Ticker: AVOP) is quoted on OTC Link (previously, "Pink Sheets"), operated by OTC Markets Group, Inc. AV1 Group was incorporated in Florida in 1998 and is based in LaJolla, California.

15.     EnviroTechnologies is an organic products company. EnviroTechnologies (Ticker: ETII) trades on OTC Link (previously, the "Pink Sheets"), operated by OTC Markets Group, Inc. EnviroTechnologies was incorporated in Delaware in 1996 under the name HIS of Virginia, Inc., and is currently headquartered in Pleasant Grove, Utah.

16.     Cyberfort is a Nevada corporation, currently headquartered in San Francisco, California, which focuses on providing cybersecurity technology. Cyberfort's common stock (Ticker: CYBF) is quoted on the OTC Markets.

## BACKGROUND

17.     The term "microcap" applies to publicly-traded companies with low or "micro" capitalizations, meaning the total value of a company's stock. Microcap stocks also are commonly referred to as "penny stocks."

18.     "Restricted stock" is stock of a publicly traded company (also known as an "issuer") acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission. Stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot be legally offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement contains

important information about an issuer's business operations, financial condition, results of operation, risk factors, and management. It also discloses any person or group who is the beneficial owner of more than 5% of the company's securities.

19.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person). "Control" means the power to direct management and policies of the company in question. Typically, affiliates include officers, directors and controlling shareholders, but any person who is under "common control" with, or has common control of, an issuer is also an affiliate.

20.     "Unrestricted stock" is stock of a publicly traded company that may be legally offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement. Registration statements are transaction-specific, however, and apply to each separate offer and sale as detailed in the registration statement. Registration, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. For example, if a control person buys shares in the company under his or her control, those shares are subject to restrictions and ordinarily require a registration for bulk sales of such shares.

21.     A "transfer agent" is an entity which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stocks.

22.     An "underwriter" is any person or entity, who either has purchased from an issuer with a view to distributing a security, or who offers or sells for an issuer (including an affiliate of an issuer) in connection with the distribution of any security.

## FACTS

### AV1 GROUP

23.     On or about May 3 and 4, 2016, no shares of AV1 Group traded in the OTC Markets.

24.     On or about May 4, 2016, O'Rourke, using the alias "Jonathan Banks," engaged in a telephone conversation with an individual referred to herein as Investor No. 1 about stocks of companies including AV1 Group.  Investor No. 1, without O'Rourke's knowledge, recorded the telephone conversation.  During the telephone conversation, O'Rourke promised that AV1 Group would be a profitable investment.  In actuality, and as O'Rourke knew or was reckless in not knowing, Black controlled AV1 Group's Float and intended to dump it into the securities markets to investors like Investor No. 1, and these anticipated sales would likely cause AV1 Group's stock price to decline significantly.

25.     During the same telephone conversation on or about May 4, 2016, O'Rourke said to Investor No. 1: "Tell you that what's going to happen . . . an IPO will come out, it will have a price target of $1 a share to start . . . they'll come to me and they'll say 'look hey Jon, the first million shares are your investors, you get your investors in, what price do you want to set them at.'  And, I'll try to negotiate as low as I can so we can meet in the middle."

26.     O'Rourke knew, or was reckless in not knowing, that his representations to Investor No. 1 on or about May 4, 2016 were, at a minimum, materially misleading because AV1 Group did not intend to issue new stock at $1.  Instead, an individual working, directly or

8

indirectly, with O'Rourke and Black intended to enter a trade around $1 to make it appear as if there was legitimate market trading at that price.

27.      On or about May 5, 2016, the individual working, directly or indirectly, with O'Rourke and Black entered an order to buy 100 shares of AV1 Group for $0.99 per share, which created the false impression of legitimate market demand at that price. The order was executed in the market, representing the only trade that day.

28.      The next day, O'Rourke talked by telephone with Investor No. 1, who recorded the conversation. O'Rourke, once again, used the alias "Jonathan" to communicate with Investor No. 1. O'Rourke persuaded Investor No. 1 to sell some securities in his possession so that he would have approximately $15,000 in his brokerage account. O'Rourke then persuaded Investor No. 1 to purchase 30,000 shares of AV1 Group stock for approximately $15,000, or approximately $0.50 per share. O'Rourke claimed that he was looking out for Investor No. 1's best interest in advising him to invest in AV1 Group.

29.      O'Rourke knew, or was reckless in not knowing, that he was not looking out for Investor No. 1's best interest on or about May 6, 2016 because he omitted the material fact that O'Rourke was working together with Black to dump millions of shares of AV1 Group stock into the market.

30.      In fact, starting on May 6, 2016, Black, through an account in the name of Neoventive, began to sell AV1 Group stock into the market, including selling 30,000 shares at or about the same time that Investor No. 1 bought 30,000 shares. In total, Black sold approximately 800,000 shares of AV1 Group stock on May 6, 2016. That day, more than 1.5 million shares of AV1 Group stock traded in the public markets.

31.     Black knew, or was reckless in not knowing, that he was selling his AV1 Group stock at or about the same time that O'Rourke was promoting AV1 Group to prospective investors as a promising investment opportunity.

32.     Between approximately May 9 and May 18, 2016, as O'Rourke continued to promote AV1 Group to prospective investors, Black sold an additional approximately 480,000 shares of AVI Group stock at prices ranging from $.33 per share to $.70 per share.

33.     By May 18, 2016, AV1 Group's stock price had declined to $.31 per share by approximately 1:58 p.m. ET.  Shortly after 2:00 p.m. ET that day, O'Rourke began purchasing AV1 Group's stock through a brokerage account under his control to create the artificial appearance of market demand at increasing prices for AV1 Group's stock.  For example, O'Rourke purchased 2,500 shares at $.40 per share at approximately 2:02 p.m. ET and purchased approximately 47,100 additional shares of AV1 Group's stock between approximately 2:02 p.m. ET and 3:57 p.m. at prices ranging from $.45 per share to $.60 per share.  By 4:00 p.m. ET, AV1 Group's stock price closed at $.75 per share.

34.     Between approximately May 19 and June 27, 2016, O'Rourke purchased another approximately 22,000 shares of AV1 Group's stock and continued to solicit one or more potential investors to do the same in order to generate market interest to facilitate Black's sales.

35.     O'Rourke also sold AV1 Group's stock while encouraging Investor No. 1 to buy additional shares of the company's stock.  On or about May 23, 2016, O'Rourke (using the Jonathan Banks moniker) said to Investor No. 1 in a recorded telephone conversation: "stock right now is available at $.83.  That's really where they want it to go.  Asking price this morning was $.90.  So they think $.83 actually is a really good discount.  But I could probably get it even cheaper for you, maybe even $.80.  But, I would need just a teeny tiny trade around $.83 after

that. So I'm curious, if we did it in your wife's account and got her the cheap stuff she would be happy about would you maybe have even like $200 or $300 left in your online account where you could put through a small trade afterwards?"

36.      Investor No. 1, at O'Rourke's request, purchased 200 shares of AV1 Group's stock at $.83 that day. O'Rourke knew, or was reckless in not knowing, that his statements to Investor No. 1 on or about May 23, 2016 were, at a minimum, materially misleading because he omitted the material fact that he sold, or would be selling, AV1 stock through his own account that day, including at $.83 per share. In fact, at or around the same time that O'Rourke encouraged Investor No. 1 to buy AV1 Group stock at $.83 per share, O'Rourke sold AV1 Group's stock at $.83 per share.

37.      In total, O'Rourke purchased and sold approximately 80,000 shares of AV1 Group stock, generating approximately $15,668 in net proceeds.

38.      In May and June 2016—in coordination with O'Rourke's efforts to promote AV1 Group to prospective investors—Black sold approximately 2.7 million shares of AV1 Group stock for proceeds of approximately $2.1 million. Black shared the proceeds of those sales with O'Rourke. Black, directly or indirectly, transferred approximately 40% of his AV1 Group stock sale proceeds, or approximately $834,666, to the account of a company controlled by O'Rourke called Tactical Holding Corp., between May 12, 2016 and August 2, 2016.

39.      Between approximately May 6, 2016 and June 30, 2016—as O'Rourke promoted AV1 Group to one or more prospective investors—approximately 172,000 shares traded per day in the securities of AV1 Group stock, as compared to an average trading volume of just approximately 110 shares traded per day in the preceding three months. By July 1, 2016, only 100 shares traded again that day, and an average of approximately 4,400 shares traded per day

between July 1, 2016 and August 31, 2016.  As of the date of this complaint, AV1 Group's stock price is $.02 per share.

40.    Between May 6, 2016 and June 28, 2016, Investor No. 1 purchased at least 136,000 shares of AV1 Group, for approximately $103,000.

## BLACK'S AV1 GROUP CROSS TRADES

41.    Despite selling approximately 2.7 million shares in coordination with O'Rourke's promotional campaign in May and June 2016, Black continued to hold shares of AV1 Group.  To sell those shares, Black, directly or indirectly, engaged an individual to buy that stock from him.  The individual represented himself to Black as someone who had a network of brokers with discretion to trade in their customers' accounts.  And, for a kickback, those brokers would buy Black's stock from him on their customers' behalf.  Unbeknownst to Black, the individual with whom Black was arranging these sales was an undercover FBI agent—the UC—who recorded the conversations.

42.    As the table below reflects, on several occasions, in late 2016 and early 2017, Black agreed to coordinate, or "cross," his sale of stock with the UC in the public securities markets in exchange for agreeing to pay a kickback to the UC.  As examples, Black engaged in the following cross trades with the UC:

| Date | Quantity |
|---|---|
| December 9, 2016 | 20,000 shares |
| December 16, 2016 | 25,000 shares |
| December 19, 2016 | 25,000 shares |
| December 20, 2016 | 25,000 shares |
| January 10, 2017 | 22,500 shares |

43.    The trades appeared as legitimate arms-length securities transactions to market participants when, in actuality, Black coordinated those trades—for a kickback—with the UC.

In furtherance of their agreement, Black arranged for the UC to be paid a kickback for buying the stock from Black.

## ENVIROTECHNOLOGIES

### Black Controlled EnviroTechnologies as a Consultant

44.    From at least December 2010 until July 2016, Black served as the President and sole director of EnviroTechnologies.  Although Black formally stepped down from those roles in or about July 2016, he continued to exercise control over the company's business.

45.    In or about July 2016, Black executed a consulting agreement with EnviroTechnologies in exchange for 7,000,000 shares of its common stock.  According to the terms of the consulting agreement executed between EnviroTechnologies and Black, Black agreed to:

> assist the Company in filing all required and necessary corporate documents with FINRA; providing strategic financial assistance; introducing the Company to third parties, including independent companies, governmental contacts, and/or third party individuals interested in purchasing its products or forming a business relationship with the Company; assisting in defining marking and business strategies for the Company; and assisting the Company in any other project the Company and Consultant [Black] agree upon relative to other Company channels and business . . . .

46.    In order to conceal his control over the company, Black removed himself as the President and sole director of EnviroTechnologies.  As a result, his name did not appear in the company's disclosures of its management and he was not obviously an affiliate of the company.  In actuality, Black continued to exercise control over EnviroTechnologies as a consultant from approximately July 2016 through at least 2018.  For example, in order to facilitate trading in the securities of EnviroTechnologies, Black prepared EnviroTechnologies' financial statements, which he then posted on OTC Markets' website, and he coordinated payments of

EnviroTechnologies' OTC Markets semi-annual fees to ensure that sufficient information was disclosed about the company so that it could be traded in the OTC Markets.

### Black and O'Rourke Controlled EnviroTechnologies Through its Stock

47.     On or about March 10, 2014, Black, through EnviroTechnologies, transferred 200,000 shares of Series A preferred (restricted) stock to a Malta-based company.

48.     On or about September 23, 2016, Black arranged for that Malta-based company to transfer 200,000 shares of Series A preferred stock to three nominee entities, referred to herein as Company A, B, and C, as follows:

    i.   Company A received 70,000 Series A preferred shares;

    ii.  Company B received 70,000 Series A preferred shares; and

    iii. Company C received 60,000 Series A preferred shares.

49.     In or about October 2016, Black arranged for Company A, B, and C to convert their Series A preferred shares into a total of 30,000,000 shares of common stock.  Black facilitated the share conversions by, among other things, providing the conversion transaction documents and instructions to EnviroTechnologies' transfer agent.  Those transaction documents included representations from EnviroTechnologies' attorney—who had also served as the company's attorney when Black was the President and sole director—that none of the three nominee entities seeking to convert the Series A shares were affiliates of EnviroTechnologies and, therefore, the stock could be unrestricted.  Black knew, or was reckless in not knowing, that these representations were false.

50.     On or about October 11, 2016, Black sent an email to EnviroTechnologies' transfer agent instructing it to "have the [Company A] and [Company B] certificates sent to" the same address in Canada, and "the [Company C] certificate" sent to a foreign asset manager based

in Switzerland.  In the same email, Black directed the transfer agent to bill EnviroTechnologies

for the cost of the certificates and delivery.

51.     In October 2016, EnviroTechnologies' transfer agent, in reliance on the attorney's

false representations, released unrestricted stock certificates to each of the three nominee entities

and distributed the certificates according to Black's instructions.

52.     On or about November 17, 2016, Company C transferred its stock to an entity

referred to herein as Company D.

53.     Black also caused EnviroTechnologies to issue approximately 20,000,000

additional shares to two additional nominee entities, referred to herein as Company E and

Company F, with whom he coordinated as follows:

    i. In or about 2011, Black caused EnviroTechnologies to issue a promissory note
       with a stock conversion provision to an entity controlled by one of Black's
       associates.  Black arranged for the conversion of the debt evidenced by the
       promissory note into EnviroTechnologies' common stock.

    ii. On or about November 1, 2016, Black, directly or indirectly, acquired the
       promissory note from his associate.  Black's associate assigned the promissory
       note to his entity Neoventive, a United States based entity that is solely
       controlled by Black.

    iii. In order to conceal his ownership and control over the shares that would be
       generated through the promissory note, on or about January 20, 2017, Black,
       through Neoventive, partially assigned the promissory note to a foreign nominee
       company controlled by a foreign asset manager, Company E.  Black arranged for
       Company E to exercise its conversion rights to obtain 10,000,000 shares of

EnviroTechnologies stock. EnviroTechnologies' attorney wrote a letter to the company's transfer agent falsely claiming that Company E was not an affiliate of the company. And, Black, who knew or was reckless in not knowing that the attorney's letters contained false representations, provided the conversion transaction documents to the company's transfer agent. As a result, the transfer agent—at Black's direction—agreed to distribute an unrestricted stock certificate to Company E.

iv. On or about April 18, 2017, Black, through Neoventive, partially assigned his convertible promissory note to another foreign nominee entity, Company F. EnviroTechnologies' attorney wrote a letter to the company's transfer agent falsely claiming that Company F was not an affiliate of the company. And, Black provided the conversion transaction documents to the company's transfer agent. As a result, the transfer agent—at Black's direction—agreed to distribute an unrestricted stock certificate for 10,000,000 shares to Company F in or about May 2017.

54. As the table below reflects, by May 2017, through the transactions described above, Black had orchestrated the issuance of 50,000,000 shares of purportedly unrestricted stock to the Companies A - F. This stock represented 100% of purportedly unrestricted stock in EnviroTechnologies' market as of January 2017 and approximately 94% of purportedly unrestricted stock in EnviroTechnologies' market as of May 2017, and approximately 22% of the

company's issued and outstanding shares.



### Sales of EnviroTechnologies Stock

55.      Between approximately February 2017 and June 2017, the Defendants and others with whom they were coordinating arranged for the foreign asset managers they had enlisted to dump the EnviroTechnologies stock.  The Defendants, directly or indirectly, arranged for the sale of their stock that was in the possession of the foreign asset managers.

56.      During that time period, one foreign asset manager sold over 2.9 million shares of EnviroTechnologies stock on behalf of Companies D and E for proceeds of approximately $3.8 million.

57.      During the same time period, another foreign asset manager sold over 966,000 shares of EnviroTechnologies stock on behalf of Company F for proceeds of approximately $295,000.

58.      The United States securities laws require registration of large scale stock sales like the stock dump that the Defendants arranged to conduct through Companies A – F, apart

from certain enumerated limitations and conditions set forth in SEC Rule 144, which were not satisfied in this case.  The Defendants were part of a control group, and therefore affiliates, of EnviroTechnologies.  Black controlled, or had the power to control, EnviroTechnologies by, among other actions, preparing and filing corporate documents and providing direction to EnviroTechnologies' transfer agent, and O'Rourke partnered with Black in exercising that control to effect a massive dump of the company's stock.  The Defendants could also exercise control over EnviroTechnologies by virtue of their control over a significant percentage of the company's stock, including virtually the entire Float.  As the chart below reflects, the Defendants' sale of EnviroTechnologies' stock constituted virtually all of the market volume in early 2017, and their coordinated trading efforts caused, directly or indirectly, a dramatic spike in EnviroTechnologies' stock price.



59.     The Defendants knew, or were reckless in not knowing, that they were required by law to register their sales of EnviroTechnologies' stock with the Commission or otherwise comply with the conditions set forth in SEC Rule 144.  To evade those rules, the Defendants

schemed fraudulently to conceal their ownership and control and to deceive investors in the market for EnviroTechnologies stock by (a) distributing stock across the seemingly unrelated nominee companies; and (b) selling their stock through the foreign asset managers.

60.     No valid registration exemption applied to the sale of the Defendants' stock.  In particular, the foreign asset managers acted as underwriters because they sold stock on behalf of the Defendants, who were affiliates of EnviroTechnologies.  A stock transaction involving an underwriter is not exempt from registration.

61.     The Defendants also failed to comply with the provisions of SEC Rule 144, including sale restrictions applicable to affiliates.  For example, the Defendants sold, directly or indirectly, more than 1% of EnviroTechnologies issued stock between February and March 2017.

62.     On or about April 12, 2017, EnviroTechnologies filed publicly an annual report for the year ended December 31, 2016.  Black prepared the report.  EnviroTechnologies disclosed certain control persons, but did not disclose Black or O'Rourke, or the companies through which they held stock, including Companies A through D.  Through Companies A through D, the Defendants controlled more than 5% of EnviroTechnologies' issued stock.

63.     The Defendants continued to control EnviroTechnologies stock after June 2017. And, O'Rourke called prospective investors to encourage them to buy EnviroTechnologies stock in 2018 in coordination with the Defendants' sale of additional EnviroTechnologies stock.

**O'Rourke's Promotion of EnviroTechnologies Stock and the Defendants' Sales**

64.     The Defendants resumed their efforts to dump EnviroTechnologies stock in 2018.  In April 2018, O'Rourke solicited multiple investors to buy EnviroTechnologies stock.  His pitches to these investors were similar to the pitches he made to sell AV1 Group stock.  He, again, used fictitious names.  O'Rourke falsely stated that he was working at or with a

well-known brokerage firm, and falsely represented that EnviroTechnologies would be a

profitable investment for the investors he solicited. O'Rourke also failed to disclose the material

information that while he was encouraging these investors to buy EnviroTechnologies stock, he

was working in a coordinated effort with Black to dump large quantities of that stock into the

demand he was working to create.

65.    In or about April 2018, an individual referred to herein as Investor No. 2 received

an unsolicited call from O'Rourke who was, again, using the alias "Jonathan." O'Rourke falsely

represented to Investor No. 2 that he worked for E*Trade—the brokerage firm at which Investor

No. 2 held an account—and recommended that Investor No. 2 invest in EnviroTechnologies.

O'Rourke made materially misleading statements to Investor No. 2, concealing the critical fact

that O'Rourke was engaging in a coordinated dump of EnviroTechnologies stock in April 2018.

66.    Investor No. 2 purchased over $49,000 worth of EnviroTechnologies stock from

April 23, 2018 through April 26, 2018, at prices ranging from approximately $1.03 to $1.14 per

share. From April 23, 2018 through April 26, 2018, O'Rourke and Black, directly or indirectly,

arranged for the sale of approximately 391,000 shares of EnviroTechnologies stock through a

foreign asset manager. Investor No. 2 eventually sold her EnviroTechnologies stock for losses of

approximately $43,000.

67.    In or about April 2018, O'Rourke contacted an individual referred to herein as

Investor No. 3 using the moniker "Jonathan" and/or "Jonathan Chase." During that call,

O'Rourke falsely represented to Investor No. 3, in substance, that Investor No. 3 would make a

lot of money if he invested in EnviroTechnologies, and O'Rourke assured Investor No. 3 that he

would receive a dividend if he purchased 100,000 shares. O'Rourke also falsely represented to

Investor No. 3 that O'Rourke had not lost client money before. In actuality, O'Rourke had

encouraged at least Investor No. 1 to invest in AV1 Group, resulting in significant losses.  And, O'Rourke knowingly or recklessly misrepresented to Investor No. 3 that EnviroTechnologies had hired TD Ameritrade Corp., the brokerage firm at which Investor No. 3 held brokerage accounts, to assist with getting EnviroTechnologies listed for trading on NASDAQ, a stock exchange. O'Rourke made these materially misleading statements to Investor No. 3, concealing the critical fact that O'Rourke was engaging in a coordinated dump of EnviroTechnologies stock in April 2018.

68.     Between April 11, 2018 and May 16, 2018, Investor No. 3 purchased approximately 114,000 shares of EnviroTechnologies stock at prices ranging from approximately $.29 to $1.13 per share.  Contrary to O'Rourke's representations, EnviroTechnologies did not issue a dividend to Investor No. 3, despite his purchase of over 100,000 shares of the company's stock.  Investor No. 3 eventually sold his EnviroTechnologies stock, suffering losses of almost 87% of his initial investment.

69.     In total, between January 30, 2018 and May 10, 2018, and in coordination with O'Rourke's efforts to promote EnviroTechnologies stock to investors, the Defendants, directly or indirectly, sold approximately 924,000 shares of EnviroTechnologies for proceeds of approximately $788,000.

70.     In total, from approximately February 7, 2017 to May 10, 2018, the Defendants, directly or indirectly, generated a total of at least $4.5 million in proceeds by selling the stock of EnviroTechnologies.

## EnviroTechnologies' Sale Proceeds

71.     As intended from the outset of the scheme, the Defendants shared in the proceeds of the foreign asset managers' stock sales in 2017 and 2018.  For example, one of the foreign

asset managers who sold EnviroTechnologies stock on behalf of Companies D and E transferred approximately $1.4 million of sale proceeds to various United States-based corporations controlled by O'Rourke.   In addition, Company A and the operator of Company A received at least $1.6 million in sale proceeds from the foreign asset managers.  As the chart below illustrates, the operator of Company A, in turn, transferred hundreds of thousands to accounts held by O'Rourke and Black. Company F also transferred money to accounts controlled by O'Rourke at or about the same time that Company F sold EnviroTechnologies stock.



## CYBERFORT SOFTWARE, INC.

72.     O'Rourke persuaded investors to purchase the stock of companies other than AV1 Group and EnviroTechnologies, including, but not limited to, the stock of Cyberfort Software, Inc. ("Cyberfort").

73.     Between March 1, 2018 and May 31, 2018, a total of 10 shares of Cyberfort were publicly traded.  At or about that time, O'Rourke, directly or indirectly, began promoting Cyberfort to prospective investors.

74.     Specifically, after O'Rourke made the misrepresentations to Investor No. 2 discussed in paragraph 65 above and recommended that Investor No. 2 invest in Cyberfort, Investor No. 2 subsequently purchased approximately 70,000 shares of Cyberfort stock from on or about July 2, 2018 through on or about July 31, 2018.

75.     In or about June 2018, O'Rourke contacted an individual identified herein as Investor No. 4 using the alias "Jonathan Chase."  O'Rourke falsely represented to Investor No. 4, in substance, that Cyberfort would issue stock in a public offering at $13 per share (over six times the actual stock price at that time).  O'Rourke falsely represented to Investor No. 4 that O'Rourke had personal knowledge that a large financial institution committed to investing millions of dollars in Cyberfort.  Ultimately, Cyberfort never announced any such investment.

76.     Based on O'Rourke's false and misleading representations, Investor No. 4 purchased over $60,000 of Cyberfort's stock between June 29, 2018 and August 10, 2018, at prices ranging from approximately $1.55 to $1.96 per share.  Shortly after these purchases, the price of Cyberfort stock fell dramatically.  Investor No. 4 subsequently sold his entire position for a loss of over $59,000.

77.     In or about July 2018, O'Rourke contacted Investor No. 3 by telephone on several occasions and encouraged him to invest in Cyberfort.  O'Rourke knowingly, or recklessly, falsely claimed in these telephone conversations that: (1) Investor No. 3 would make money if he invested in Cyberfort stock; (2) Investor No. 3 would receive Cyberfort warrants after he purchased Cyberfort stock; (3) O'Rourke believed that Cyberfort's stock price would increase by 100% to 120% in 60 days; and (4) Cyberfort—a company with little to no revenues—provided cybersecurity services for a number of Fortune 500 companies.

78.     Investor No. 3 ultimately purchased approximately 110 shares of Cyberfort stock on or about August 8, 2018.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### (Violations of Section 17(a) of the Securities Act)
#### (O'Rourke)

79.     Paragraphs 1 through 78 above are re-alleged and incorporated by reference as if fully set forth herein.

80.     By reason of the conduct described above, O'Rourke, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

81.     By reason of the conduct described above, O'Rourke violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a)(1) and (3) of the Securities Act)
### (Black)

82.     Paragraphs 1 through 78 above are re-alleged and incorporated by reference as if fully set forth herein.

83.     By reason of the conduct described above, Black, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

84.     By reason of the conduct described above, Black violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

## THIRD CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)
### (O'Rourke)

85.     Paragraphs 1 through 78 above are re-alleged and incorporated by reference as if fully set forth herein.

86.     By reason of the conduct described above, O'Rourke, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made not

misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

87.     By reason of the conduct described above, Garrett O'Rourke violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## FOURTH CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder)**
**(Black)**

88.     Paragraphs 1 through 78 above are re-alleged and incorporated by reference as if fully set forth herein.

89.     By reason of the conduct described above, Michael J. Black, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

90.     By reason of the conduct described above, Black violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## FIFTH CLAIM FOR RELIEF
## UNREGISTERED OFFERINGS OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act)**
**(Black and O'Rourke)**

91.     Paragraphs 1 through 78 above are re-alleged and incorporated by reference as if fully set forth herein.

92.     By reason of the conduct described above, the Defendants, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of EnviroTechnologies, as to which no registration statement has been filed and for which no exemption from registration has been available.

93.     As a result, the Defendants violated Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.     Temporarily, preliminarily, and permanently restrain the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c), and 77q], and Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

B.     Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

C.     Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.      Enter an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

DATED this 17 day of July 2019.

Respectfully submitted,

Lara Shalov Mehraban

Marc P. Berger
Amy Gwiazda*
Sandeep Satwalekar
Eric Forni*
Kathleen Shields*
Rhonda Jung

Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0161 (Satwalekar)

*Not admitted in the U.S. District Court for the
Eastern District of New York