```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
SECURITIES AND EXCHNAGE COMMISION,

                    Plaintiff,
                                        MEMORANDUM AND ORDER
         v.
                                        19-CV-4137(KAM)(PK)
GARRETT O'ROURKE and
MICHAEL J. BLACK,

                    Defendants.
----------------------------------X
```

**KIYO A. MATSUMOTO, United States District Judge**:

Presently before the court is a motion filed by the plaintiff in this action, the Securities and Exchange Commission ("SEC"), seeking disgorgement and prejudgment interest from one of the defendants, Garrett O'Rourke ("Mr. O'Rourke"), following a settlement between the SEC and Mr. O'Rourke.  For the reasons set forth below, the court finds that Mr. O'Rourke owes the SEC $5,315,186 in disgorgement, plus prejudgment interest

## Background

The SEC filed this lawsuit against Mr. O'Rourke and his co-defendant in July 2019, alleging that from May 2016 through July 2018, the defendants engaged in a scheme in which they sold stocks of companies they controlled to investors without revealing their stakes in the companies.  (*See generally* ECF No. 1, Complaint.)  According to the SEC's allegations, Mr. O'Rourke made cold calls to "elderly retail investors," and,

1

while "proms[ing] these investors that he had their best interests in mind," attempted to persuade them to buy stocks so that he and his co-defendant would profit off of the sale. (*Id.* ¶ 2.)

Early on in this litigation, the SEC sought a temporary restraining order over Mr. O'Rourke's assets, which the court granted. (ECF No. 7, Order to Show Cause.) Subsequently, the SEC and Mr. O'Rourke agreed to a stipulation that froze certain of Mr. O'Rourke's assets, but allowed him to pay his reasonable living expenses and attorneys' fees. (ECF No. 24, Stipulation and Order.) That stipulation has been subsequently amended several times. (*See* ECF Nos. 50, 63, 74.)

In January 2020, the parties jointly moved for approval of a judgment against Mr. O'Rourke following a settlement. (ECF No. 52, Joint Motion for Judgment Based on Settlement; *see* ECF No. 52-1, Proposed Judgment as to Defendant O'Rourke.) The court approved the judgment, which enjoined Mr. O'Rourke from violating the Securities Exchange Act of 1934 and the Securities Act of 1933, and found him liable for disgorgement and prejudgment interest in an amount to be subsequently determined. (*See* ECF No. 54, Order Granting Joint Motion for Judgment.) The SEC has now submitted a motion regarding the amount of disgorgement and prejudgment interest, and Mr. O'Rourke has responded to the motion.

2

**Legal Standard**

"Where a party violates the federal securities laws, th[e] [c]ourt has broad discretion not only to order the disgorgement of any ill-gotten gains, but also to determine the amount to be disgorged." *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 562-63 (S.D.N.Y. 2009), *aff'd*, 438 F. App'x 23 (2d Cir. 2011) (citing *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir.1997) and *SEC v. First Jersey Sec.*, Inc., 101 F.3d 1450, 1474 (2d Cir.1996)). Disgorgement is to be "remedial rather than punitive[.]" *SEC v. Cavanagh*, 445 F.3d 105, 117 n.25 (2d Cir. 2006).

"In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his fraud." *Universal Exp.*, 646 F. Supp. 2d at 563. The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989)).

"In addition to its discretion to order disgorgement, a court has the discretion to award prejudgment interest on the amount of disgorgement and to determine the rate at which such interest should be calculated." *Universal Exp.*, 646 F. Supp. 2d at 566 (citing *First Jersey*, 101 F.3d at 1476).

**Discussion**

The SEC argues that Mr. O'Rourke should pay $6,102,854 in disgorgement,[1] and $593,449 in prejudgment interest, for a total of $6,696,303.  (ECF No. 59-3, SEC Reply Brief ("Reply"), at 6.)  Mr. O'Rourke "is ready to disgorge $5,214,986 in principal, and prejudgment interest theron of $530,512, for a total of $5,745,498."  (ECF No. 60-1, Defendant's Memorandum in Opposition ("Opp."), at 1.)

Thus, the court must resolve the parties' difference, which amounts to just under one million dollars in total.  Specifically, Mr. O'Rourke objects to three categories of funds identified by the SEC for disgorgement: (1) money that Mr. O'Rourke earned by selling his "sales leads," (2) money that Mr. O'Rourke moved between accounts that he controlled, and (3) money Mr. O'Rourke paid as commission to individuals working in the call center he oversaw.  The court will discuss each category of funds in turn.

### I. Money Paid to Mr. O'Rourke for "Sales Leads"

Mr. O'Rourke contends that $31,336 of the amount of disgorgement sought by the SEC was money that was paid to him in exchange for "sales leads," and was "not connected in any way to

---

[1] Initially, the SEC sought $6,110,221 in disgorgement (plus corresponding interest).  (ECF No. 59-1, SEC's Motion for Monetary Remedies ("Mot."), at 4.)  In response to additional information provided by Mr. O'Rourke, the SEC revised its analysis and lowered its request by $7,367.  (*See* Reply at 3-5.)

4

the transactions described [i]n the SEC's complaint[.]" (Opp. at 5-6; *see* ECF No. 60-2, Declaration of Garrett O'Rourke ("O'Rourke Decl."), ¶ 4.) The SEC counters that the "sales leads" sold by Mr. O'Rourke were actually lists of the victims of his fraudulent scheme, and thus the proceeds are subject to disgorgement. (*See* Reply at 2-3.)

The court agrees with the SEC that the money Mr. O'Rourke received for selling lists of victims of his scheme was, contrary to his contention, connected to the fraud, and should be deemed ill-gotten gains that must be disgorged. Mr. O'Rourke earned this money from two transactions, in January 2018 and February 2018. (O'Rourke Decl. ¶ 4.) According to the SEC's complaint, his scheme was still ongoing at that time. (Compl. ¶ 1.)

"A wrongdoer's unlawful action may create illicit benefits for the wrongdoer that are indirect . . . ." *SEC v. Contorinis*, 743 F.3d 296, 306 (2d Cir. 2014). It is not clear to the court what value Mr. O'Rourke's lists of "leads" would have had to a buyer had it not been for his fraud, as it seems likely that the value was dramatically increased by the fact that the lists consisted of people Mr. O'Rourke was successfully able to obtain money from through fraudulent tactics. That fact would have made the lists enticing to any salesman, legitimate or otherwise. The fraudulent scheme, therefore, was causally

5

connected to the value of the lists, and allowing Mr. O'Rourke to keep this money would be to allow him to "unjustly enrich[] [himself] through violations" of the securities laws. *Cavanagh*, 445 F.3d at 117.

Accordingly, the SEC properly requests disgorgement of this $31,336 that Mr. O'Rourke has objected to.

**II.  Money Transferred to Other Accounts by Mr. O'Rourke**

Mr. O'Rourke next argues that $56,231 of the money originally sought by the SEC is money that Mr. O'Rourke "transferred from one of his accounts to another account," and that the SEC failed to trace "these funds to any transaction" that was fraudulent. (Opp. at 6.) Mr. O'Rourke attests that he does "not recall that these funds are traceable to those transactions." (O'Rourke Decl. ¶ 5.) The SEC revised its analysis after its initial motion, and reduced the amount from these transactions that should be disgorged to $48,864, instead of $56,231. (Reply at 5.)

According to the SEC's forensic accountant, the $48,864 sought by the SEC represents the proceeds of fraudulent stock sales, which Mr. O'Rourke subsequently transferred out of an account he held with an entity called WB21. (ECF No. 59-4, Declaration of Trevor T. Donelan ("Donelan Decl."), ¶ 8.) Specifically, in November 2016, Mr. O'Rourke received $20,000 into his WB21 account from a foreign company that was part of

6

the complex scheme to conceal the movement of Mr. O'Rourke's and his co-defendant's money, and Mr. O'Rourke then transferred $19,392 of that sum to a realtor in Florida. (*Id.* ¶ 8(b); *see* Compl. ¶¶ 47-54.) In March 2017, Mr. O'Rourke received $29,975 into his WB21 account from another foreign company that was part of the scheme, and then transferred $29,472 of it to a bank account in the name of a company called DRG America LLC. (Donelan Decl. ¶ 8(d).)

The SEC's analysis persuasively shows that the $48,864 transferred by Mr. O'Rourke out of his WB21 account in these two transactions was indeed directly related to the fraudulent scheme. Mr. O'Rourke has not proffered any evidence to counter the SEC's analysis, beyond his sworn statement that he does "not recall" that the funds were traceable to fraudulent transactions.

Accordingly, the SEC is entitled to disgorgement of the $48,864 identified by its forensic accountant.

### III. Funds Paid by Mr. O'Rourke to Co-Conspirators as Commission

Mr. O'Rourke's largest objection to the SEC's disgorgement request is to $787,668[2] that Mr. O'Rourke contends passed through his possession as part of the scheme, but which

---

[2] Mr. O'Rourke's opposition brief lists this amount as $787,788, but at other points, as $787,688. (*See* Opp. at 6-8.) Based upon the exhibit submitted by Mr. O'Rourke, it appears that the correct number is actually $787,668.

7

he did not retain or benefit from.  (*See* Opp. at 6-7.) According to Mr. O'Rourke, this amount represents money that he paid out to co-conspirators as commission in connection with the scheme.  (O'Rourke Decl. ¶ 6.)  These co-conspirators worked with Mr. O'Rourke, calling prospective victims of the fraudulent scheme, and the payments made to them by Mr. O'Rourke represented a portion of the money they brought in.  (*Id.*)

"Although the SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment, once the SEC has made a reasonable showing of a defendant's illicit profits, the burden shifts to the defendant to show that the disgorgement figure was not a reasonable approximation." *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007).  Here, Mr. O'Rourke has submitted a detailed summary of all of the payments he made to eight co-conspirators between 2016 and 2018, totaling $787,668. (O'Rourke Decl., Ex. A.)

The SEC relies upon two cases in which courts have ordered disgorgement of ill-gotten gains, even where defendants had not kept the money, but rather had paid it out to employees or co-conspirators.  In one case, the late Judge Peter K. Leisure reasoned that such money should be disgorged because a promise of part of the profits "entice[d] [others] to join [the defendant] and build a trading department," without which the

8

defendant "would not have been able to play the integral role it did in the" fraud.  *SEC v. U.S. Envtl., Inc.*, No. 94-cv-6608, 2003 WL 21697891, at *28 (S.D.N.Y. July 21, 2003), *aff'd*, 114 F. App'x 426 (2d Cir. 2004).  In the other case, former district court Judge Gerard E. Lynch held that "proceeds from an individual's violations of the securities laws—including payments to one's co-conspirators—do not provide a justification for reducing the amount to be disgorged."  *Universal Exp.*, 646 F. Supp. 2d at 564.

The court, however, finds that Mr. O'Rourke has the better argument on this point.  As Judge Lynch noted in *Universal Express*, "a court may, in its discretion, deduct from the disgorgement amount any direct transaction costs, such as brokerage commissions, that plainly reduce the wrongdoer's actual profit[.]"  *Id.* (quotation omitted).  Notably, in *Universal Express*, the defendant was held jointly and severally liable with the co-conspirator to whom he sent the money.  *Id.* at 564 n.8.

Here, on the other hand, the court cannot hold Mr. O'Rourke jointly and severally liable with the co-conspirators to whom he paid a commission, because none of them are parties to this action.  In fact, none have been sued by the SEC, though Mr. O'Rourke indicates that he "will do all he can to assist the SEC in that lawsuit," should one be brought.  (Opp. at 8.)  The

9

$787,668 paid as commission to those individuals clearly represents ill-gotten gains that would be subject to disgorgement, but these were ill-gotten gains received by co-conspirators who are not presently before the court. It was not an ill-gotten gain received by Mr. O'Rourke, and so he should not be required to pay money that did not constitute his "actual profit." *Universal Exp.*, 646 F. Supp. 2d at 564. Ordering him to do so would be punitive rather than remedial, which is directly contrary to the principles underlying disgorgement in securities fraud cases. *Cavanagh*, 445 F.3d at 117 n.25 (2d Cir. 2006).

Accordingly, Mr. O'Rourke is not required to pay as disgorgement the $787,668 that he paid out as commission. Subtracting that amount from the SEC's total request results in a disgorgement of $5,315,186.

**IV.   Prejudgment Interest**

Finally, Mr. O'Rourke argues that he should not be liable for prejudgment interest on the money he paid out as commission, nor on the money he received for selling his sales leads or that he transferred between accounts. (Opp. at 10-11.)

Because the court has found that Mr. O'Rourke need not pay as disgorgement the money that he paid out in commission, the court agrees that he does not owe prejudgment interest on that amount. However, Mr. O'Rourke is liable for prejudgment

10

interest on the remaining $5,315,186, at the rate used by the Internal Revenue Service for the underpayment of federal income tax. *See First Jersey*, 101 F.3d at 1476; (Mot. at 2-3 ("With respect to the calculation of prejudgment interest, the parties have also agreed that prejudgment interest shall be calculated based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. §6621(a)(2).")).

The court acknowledges that Mr. O'Rourke has been denied the use of approximately $8 million in assets, pursuant to the preliminary injunction entered in this case, while the current motion was pending before the court. The amount of funds Mr. O'Rourke was enjoined from accessing exceeded the amount that he is now being ordered to pay in disgorgement. Because the purpose of ordering a defendant to pay prejudgment interest is to "prevent[] a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity," *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996), Mr. O'Rourke should only be liable for prejudgment interest during the time period he had access to the funds, which was up until the preliminary injunction was entered on July 31, 2019.

11

## Conclusion

For the foregoing reasons, Mr. O'Rourke is ordered to pay $5,315,186 in disgorgement, plus prejudgment interest calculated at the IRS underpayment rate through July 31, 2019. Within seven days of this Memorandum and Order, the SEC shall submit a revised calculation of prejudgment interest. Mr. O'Rourke will then have seven days to submit any objections to that calculation. The parties should also advise the court whether any outstanding issues remain with regard to Mr. O'Rourke. If there are no objections to the calculation of prejudgment interest and no further issues to be decided, the Clerk of Court will then be directed to enter judgment against Mr. O'Rourke.

**SO ORDERED.**

Dated:   Brooklyn, New York
         November 9, 2020

                                    /s/
                            Hon. Kiyo A. Matsumoto
                            United States District Judge